UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GRACE P. PALM,

               Plaintiff,

    -against-

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
-------------------------------------------------------------X
FEUERSTEIN, District Judge:

FILED
CLERK

7/15/2016 3:53 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**OPINION AND ORDER**
15-cv-0637 (SJF)

Plaintiff Grace Palm ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final determination of defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying her applications for disability insurance benefits. Before the Court is the Commissioner's unopposed motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the following reasons, the Commissioner's motion is granted.

I.     BACKGROUND

    A.     Procedural Background

On May June 29, 2012, Plaintiff applied for Social Security disability insurance benefits, alleging a disability onset date of September 5, 2009. (Transcript of Administrative Record (Dkt. 16) ("Tr.") at 106-07. Plaintiff alleged disability due to leg, ankle, and back injury, and nerve damage. (*Id.* at 55, 134). Plaintiff's application was denied initially and upon reconsideration. (*Id.* at 49-58). On September 13, 2012, Plaintiff requested a hearing before an administrative law judge. (*Id.* at 57-58). On July 12, 2013, a hearing was held before Administrative Law Judge April M. Wexler (the "ALJ"), at which Plaintiff appeared with counsel. (*Id.* at 27-48). In a written decision dated August 5, 2013, the ALJ found that Plaintiff was not disabled under the

Social Security Act from September 5, 2009, the alleged onset date, through the date of her decision. (*Id.* at 9-26). On August 13, 2013, Plaintiff requested review of the ALJ's decision by the Appeals Council. (*Id.* at 7-8). On December 10, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision to deny benefits the final decision of the Commissioner. (*Id.* at 1-4). On February 5, 2015, Plaintiff commenced this action *pro se*. On October 13, 2015, the Commissioner moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### B. Non-Medical Evidence

#### 1. Plaintiff's Personal and Employment History

Plaintiff was born on July 25, 1957. (*Id.* at 30). She completed two (2) years of college, earning an Associate's degree. (*Id.* at 31). Plaintiff worked as a school bus driver from September 1993 to June 2005, a teacher's aide from April 2005 to June 2006, an office manager at an insurance company from June 2006 to August 2008, and a receptionist at a medical office from September 2008 to September 2009. (*Id.* at 31-34, 135, 160-170). Apart from a brief attempt to return to her receptionist position in the fall of 2009, she has not been employed since approximately September 5, 2009, when she fell and fractured her left ankle. (*Id.* at 34-35)

#### 2. Plaintiff's Self-Reporting in her Social Security Application

On June 20, 2012, Plaintiff completed a function report in support of her application for Social Security benefits, from which the following facts are taken. (*Id.* at 145-54). Plaintiff lived in a house with her family. (*Id.* at 145). Plaintiff cared for her family; she did laundry, cooked, dusted, swept, and fed the family's pet(s). (*Id.* at 146, 148). Other members of the family walked the pet(s). (*Id.*). Plaintiff had no problems grooming and taking care of herself. (*Id.* at 146-47). She prepared dinner for her family three (3) to four (4) times per week. (*Id.* at

147).   Plaintiff needed assistance vacuuming and carrying laundry up and down stairs.   (*Id.* at 148).

Plaintiff went outside frequently, drove a car, and was able to go out alone.   (*Id.* at 148-49).   She shopped in stores and online.   (*Id.* at 149).   She was able to pay bills, count change, and manage a savings account.   (*Id.*).   Her hobbies included reading, crocheting, doing puzzles, and watching television, and she took part in these activities daily.   (*Id.*).   She was no longer able to go to the gym or exercise, and could no longer stand, sit, or walk for extended periods of time.   (*Id.*).   She socialized with others on a daily basis, and had no problems getting along with other people.   (*Id.* at 150).   She went to the library on a weekly basis.   (*Id.*).

She could not lift large or heavy objects, could stand for a short time, could walk a maximum of one-quarter (1/4) mile before resting, could sit for short periods, had difficulty climbing stairs, and could not kneel, squat, or reach.   (*Id.* at 150-52).   She did not use any assistive devices, such as crutches or a cane.   (*Id.* at 151).   She had no problems paying attention, remembering things, or finishing what she started, was able to follow spoken and written instructions, had never had any problems getting along with bosses or other people in positions of authority, and had never lost a job due to interpersonal problems.   (*Id.* at 152-53).   She was not adversely affected by stress or changes in schedule.   (*Id.* at 153).

Plaintiff reported first experiencing pain during rehabilitation / physical therapy.   (*Id.*).   She had "constant dull" pain in her lower left leg (from the knee down), "sharp stabbing" pain in her left ankle, and a "dull to sharp ache" in her middle and lower back.   (*Id.*).   The pain in her middle and lower back radiated to her upper back.   (*Id.* at 154).   She experienced the pain daily upon walking, sitting, and general movement.   (*Id.*).   The pain was constant.   (*Id.*).   To manage

the pain, she used Voltaron gel, which began working within ten (10) minutes of application, relieved the pain for two (2) to three (3) hours, and had no side effects. (*Id.* at 154-55).

### 3. Plaintiff's Testimony at the Administrative Hearing

At the July 12, 2013 hearing before the ALJ, Plaintiff testified that she was fifty-five (55) years old, and lived in a house with her husband, who was employed full-time, along with her three (3) adult children and her son-in-law. (*Id.* at 30-31). Plaintiff had completed two (2) years of college, earning an associate's degree, had a driver's license, and drove a car. (*Id.* at 31). Plaintiff discussed her work history as a school bus driver, teacher's aide, office manager, and receptionist, and indicated that she stopped working as a receptionist on September 5, 2009. (*Id.* at 31-34). Although she attempted to return to her receptionist position in the fall of 2009, she was unable to continue due to injury to her leg following a fall in September 2009 and chronic back problems. (*Id.* at 34-35).

Plaintiff testified that the severity of her back pain was a seven (7) on a scale of one (1) to ten (10) and that her left leg and ankle pain was a five (5) or six (6). (*Id.* at 41). The back pain was "pretty much constant" and the leg and ankle pain "just depend[ed], sometimes on the weather" or if she had "been trying to walk or … do anything." (*Id.*). Plaintiff also said that she experienced symptoms of vertigo four (4) to five (5) times per month, which lasted for a very brief time on each occasion. (*Id.* at 39, 44). Plaintiff said that she had fallen in some bushes in her yard the previous summer due to her vertigo but that she had not been injured. (*Id.* at 44). Her treatment for these conditions included seeing a neurologist regularly and a chiropractor once a week. (*Id.* at 34-35). She used Lidoderm patches and Voltaren gel for pain relief, but was not taking any prescription pain medications or using any assistive devices. (*Id.* at 35-36, 40). She did not receive any treatment for vertigo. (*Id.* at 44).

As to Plaintiff's daily activities, she testified that she spent most of her time at home, took short trips to run errands, prepared simple meals for herself and her family, and performed lightweight household chores like loading the dishwasher, putting groceries away, and doing laundry. (*Id.* at 36-39, 41). She did not do heavier chores like vacuuming, mopping, or carrying a basket of laundry up and down stairs. (*Id.* at 37). She said that she sat down to do laundry and put groceries away. (*Id.* at 36-37). She showered and dressed herself, but it was difficult for her to bend over to tie her shoes and she needed to sit down to put on pants. (*Id.* at 36, 41).

As to leisure and social activities, Plaintiff testified that she and her husband had dinner with friends at restaurants or friends' homes two (2) or three (3) times per month, but sat at a table and did not walk around the room. (*Id.* at 37). She was able to ride in cars with lumbar support in the seat, including on four (4)-hour trips to Washington, D.C. to visit her daughter, most recently in April 2009. (*Id.* at 38). She could no longer take car trips to Michigan to visit friends. (*Id.* at 38). She no longer went to the beach because walking in the sand was difficult; she no longer exercised at the gym or went for long walks. (*Id.* at 38-39).

As to her general physical capabilities, Plaintiff testified that she was able to sit for about twenty (20) minutes before needing to stand and stretch, and that she was able to stand for about twenty (20) minutes before needing to sit down or lean on something. (*Id.* at 39-40). She was unable to stoop or bend, and climbed stairs with difficulty. (*Id.*). She said that her pain and discomfort made it difficult to concentrate. (*Id.* at 42).

### 4.    Vocational Expert Testimony

During the July 12, 2013 hearing, Rocco Meola, a vocational expert, answered the ALJ's and Plaintiff's attorney's questions regarding Plaintiff's potential employment prospects. (*Id.* at 45-47). Mr. Meola testified that, based upon his review of Plaintiff's work history, Plaintiff had

worked as a bus driver, teacher's aide, office manager, and receptionist.  (*Id.* at 46).   The ALJ

directed Mr. Meola to consider a hypothetical individual of the Plaintiff's age, education, and

work experience, and to assume the following limitations: limited to sedentary work; occasionally

lift ten (10) pounds; sit for approximately six (6) hours; stand or walk for approximately two (2)

hours in an eight (8)-hour day with normal breaks; occasionally climb ramps or stairs; never

climb ladders, ropes, or scaffolds; occasionally balance or stoop; never kneel, crouch, or crawl;

push and pull without limitation; avoid concentrated exposure to fumes, odors, dust, gasses, and

poor ventilation; avoid heights or heavy machinery; and avoid extreme temperatures.  (*Id.*).   Mr.

Meola testified that such a hypothetical individual with these limitations could work as a

receptionist, but could not perform Plaintiff's other past jobs (bus driver, teacher's aide, or office

manager).  (*Id.* at 46-47).   If such a hypothetical individual with these limitations would also

need to be absent from work three (3) to four (4) times per month, Mr. Meola testified that they

could not work as a receptionist.  (*Id.* at 47).   If such a person could only sit for less than two (2)

hours and stand for about two (2) hours, Mr. Meola testified that they could not work as a

receptionist.  (*Id.*).

> ### C.      Medical Evidence
>
> #### 1.       George Washington University Hospital Records

On September 6 and 7, 2009, Plaintiff was treated at the George Washington University

Hospital for a fractured ankle following a trip and fall on September 5.  (*Id.* at 747-70).

Examination of Plaintiff's left ankle revealed deformity, tenderness to palpation, reduced or non-

existent range of motion, and diminished pulse.  (*Id.* at 750, 755-56).   An X-ray of the left ankle

revealed fractures at the distal fibular shaft and medial malleolar, and damage to the fibiolatar

joint.  (*Id.* at 756, 768-70).   The diagnosis was a trimalleolar fracture.  (*Id.* at 749, 756).

Plaintiff underwent an open reduction and internal fixation of the left tibia and fibula surgery, and was discharged on September 7, 2009 with instructions to use crutches, wear a splint, avoid weight-bearing activities, and follow up with a physician within ten (10) to fourteen (14) days. (*Id.* at 747-48, 756-57, 760-70).

## 2. Dr. Neil Watnik – Orthopedist

On September 18, 2009, Plaintiff visited Dr. Neil Watnik, an orthopedist, to follow up on her left ankle fracture and the recent surgery. (*Id.* at 426-27). Dr. Watnik's notes from the visit indicate that Plaintiff was tolerating the splint well with mild pain, had no numbness or tingling in her toes, and no calf pain. (*Id.* at 426). Examination revealed mild swelling and diminished range of motion in her left ankle, but no deformity or nerve damage. (*Id.*). An X-ray of Plaintiff's left ankle showed that two (2) screws and a plate were stabilizing the fracture and that the mortise and syndesmosis were anatomically reduced. (*Id.*). Dr. Watnik removed staples from the left ankle, placed Plaintiff in a cam walker, and advised her to begin range of motion exercise, to avoid putting weight on her left ankle, and to return for another appointment in two (2) weeks. (*Id.*).

Plaintiff next saw Dr. Watnik on October 2, 2009. (*Id.* 428, 797). Plaintiff reported improvement in her left ankle pain. (*Id.* at 428). Examination of the left ankle revealed mild swelling and tenderness, and moderately decreased range of motion, but no deformity or signs of infection. (*Id.*). X-rays showed that Plaintiff's fracture was healing in an acceptable position. (*Id.*). Dr. Watnik's treatment plan consisted of Plaintiff continuing local modalities, beginning physical therapy, bearing weight as tolerated, and following up with another appointment in two (2) weeks. (*Id.* at 428, 796).

On October 14, 2009, Plaintiff returned to Dr. Watnik and her condition had improved. (*Id.* at 429, 798). Examination revealed mild swelling, minimal tenderness over the fracture sites, and diminished tibiotalar and subtalar ranges of motion, but also showed that the incisions were healed without signs of infection, no deformity, no signs of complex regional pain syndrome, and no signs of nerve damage. (*Id.* at 429). X-rays showed that the fracture was healing in appropriate alignment. (*Id.*). Dr. Watnik indicated that the fracture was healing well and that Plaintiff should continue physical therapy, stop using the cam walker, and progress to weight-bearing activities in an air cast. (*Id.*).

Plaintiff returned to Dr. Watnik on November 13, 2009, reporting that her ankle pain had improved further. (*Id.* at 430, 799). Examination of the left ankle revealed decreased range of motion, mild swelling, and mild tenderness, but was otherwise normal. (*Id.* at 430). X-rays of the left ankle showed that the fracture had healed. (*Id.*). Dr. Watnik recommended continuing local modalities and aggressive physical therapy, and discontinuing use of the brace. (*Id.*).

On December 11, 2009, Plaintiff followed up with Dr. Watnik and reported that her left ankle pain had further improved. (*Id.* at 431). Examination of the left ankle revealed mild swelling, minimal tenderness to palpation over the fracture sites, and a mild decrease in range of motion, but was otherwise normal. (*Id.*). Dr. Watnik recommended that Plaintiff continue physical therapy and follow up in two (2) months. (*Id.*).

Plaintiff saw Dr. Watnik again on December 23, 2009. (*Id.* at 432). Examination of the left ankle revealed mild swelling, mild tenderness to palpation over the lateral ankle ligamentous complex, and a mild decrease in range of motion, but was otherwise normal. (*Id.*). Dr. Watnik recommended that Plaintiff continue physical therapy, take more time off from work, and follow up with him in one (1) month. (*Id.*).

On January 20, 2010, Plaintiff had a follow up appointment with Dr. Watnik. (*Id.* at 433). Dr. Watnik's notes from that day indicate that Plaintiff continued to complain of pain despite being able to bear full weight on her left ankle without the aid of an assistive device. (*Id.*). Examination of the left ankle revealed diffuse mild tenderness and improving range of motion that remained diminished, no vasomotor changes consistent with complex regional pain syndrome, and was otherwise normal. (*Id.*). X-rays revealed that the fracture had healed in an anatomic position. (*Id.*). Dr. Watnik recommended that Plaintiff see Dr. Edward Rubin, a pain management specialist, for a complex regional pain syndrome evaluation. (*Id.*).

Plaintiff returned to Dr. Watnik on February 24, 2010. (*Id.* at 434). Plaintiff told Dr. Watnik that she had not followed Dr. Rubin's recommendations regarding complex regional pain syndrome, but that she was seeing her own neurologist (Dr. Singh, discussed below) who was treating her pain, and that she was doing better. (*Id.*). Examination of the left ankle revealed minimal swelling and near full range of motion with only mild discomfort. (*Id.* at 434). Dr. Watnik indicated that the left ankle fracture had healed in a good position and recommended that Plaintiff follow up with her neurologist and return to Dr. Watnik if necessary. (*Id.*).

On June 14, 2010, Plaintiff saw Dr. Watnik and told him that her pain had improved. (*Id.* at 435, 800). Examination of the left ankle revealed no swelling, no tenderness to palpation, and was normal in all other respects. (*Id.* at 435). Dr. Watnik recommended that Plaintiff continue physical therapy and follow up with him as needed. (*Id.* at 435, 800).

Plaintiff followed up with Dr. Watnik on November 12, 2010, and reported recurrent pain in her left ankle that was diffuse and not related to activity. (*Id.* at 436). She also reported hypersensitivity and occasional tingling. (*Id.*). Examination of the left ankle revealed no swelling and a full range of motion with mild pain, and was normal in all other respects. (*Id.*).

9

Dr. Watnik recommended that Plaintiff return to her neurologist or Dr. Rubin for pain management and treatment of complex regional pain syndrome.   (*Id.*) [1]

### 3.      Dr. Edward Rubin – Pain Management Specialist

On January 20, 2010, upon Dr. Watnik's referral, Plaintiff saw Dr. Edward Rubin, a pain management specialist, regarding her left ankle.   (*Id.* at 726-27).   Plaintiff reported experiencing pain that was "sharp and shooting and throbbing in nature," and that radiated to nowhere in particular.   (*Id.* at 726).   She rated the severity of her pain four out of ten (4/10) on average, and said it was aggravated by walking and improved by laying down.   (*Id.*).   A full-body examination revealed hypersensitivity in the left foot and allodynia, but otherwise normal strength, range of motion, and functioning in the upper and lower body.   (*Id.* at 727).   Dr. Rubin diagnosed reflex sympathetic dystrophy of the lower left limb, gave Plaintiff a lumbar sympathetic block injection, and advised her to return in two (2) weeks.   (*Id.*).   There is no evidence in the record that Plaintiff ever returned to Dr. Rubin.

### 4.      Dr. Tej Singh – Neurologist

On February 9, 2010, Plaintiff visited Dr. Tej Singh, a neurologist, with a chief complaint of left leg pain.   (*Id.* at 633-35).   She reported that she had been doing well after surgery and had been doing physical therapy.   (*Id.* at 633).   She reported using a walker around Halloween, and walking unassisted but with a limp by Thanksgiving.   (*Id.*).   She was able to be on her feet for a good portion of the day at home until the pain worsened.   (*Id.*).   Stairs were still difficult for her. (*Id.*).   She reported getting a sharp pain in the arch of her foot and an achy pain over her shin, and said that her toes were sensitive and the pain worsened with rain or snow.   (*Id.*).   She reported

---

[1]  Between October 5, 2009 and August 16, 2010, Plaintiff attended numerous physical therapy sessions in accordance with Dr. Watnik's recommendations.   The notes from these sessions generally pertain to Plaintiff's fluctuating self-assessments of own left ankle / leg pain, generally reflect improvement over time, and add little to Dr. Watnik's reports for present purposes.   (*See id.* at 224-382, 437-553).

that her strength was "pretty good." (*Id.*). She reported taking Tylenol or Motrin sparingly and had just started acupuncture, which she felt may be helping. (*Id.*). She also reported having chronic balance problems and minor memory difficulty. (*Id.* at 635). Examination revealed wide-based gait; decreased sensation in the cervical and lumbosacral spine; hyperesthesia in the lower extremities; decreased proprioception in the toes; crossed adductor reflex; and hyperactive Achilles and patellar reflexes. (*Id.* at 634-35). Examination otherwise revealed normal strength and functioning. (*Id.*). Dr. Singh noted signs of multiple cervical and lumbosacral radiculopathy, a peripheral neuropathy, and long tract signs. (*Id.* at 635). He also noted high arched feet and significant sensory ataxia. (*Id.*). Dr. Singh ordered an electro myelogram ("EMG"), nerve conduction studies, and blood work, advised Plaintiff to continue physical therapy, and prescribed Lidoderm and Celebrex. (*Id.*).

Dr. Singh's impressions based on the EMGs included left C5, C6 and L5 radiculopathies, no significant axonal loss, and moderate bilateral demyelinating sensory median nerve neuropathy at the wrist consistent with carpal tunnel syndrome. (*Id.* at 208). Dr. Singh ordered a magnetic resonance imaging ("MRI") study of Plaintiff's lumbosacral spine to rule out L5 nerve root compression and an MRI of Plaintiff's cervical spine to determine if she had disc herniation. (*Id.* at 201). He also prescribed wrist splints to treat carpal tunnel syndrome. (*Id.*).

During an April 2, 2010 appointment, Plaintiff reported to Dr. Singh that she had been using wrist splints and Naproxen, and was feeling better. (*Id.* at 666). Dr. Singh's notes indicate that Plaintiff was "trying to get back to work, but she [was] having issues with that." (*Id.*). The MRIs revealed cervical and lumbar disc degeneration, which, in Dr. Singh's opinion, explained the results of prior nerve conduction studies. (*Id.* at 668). Dr. Singh diagnosed cervical disc disorder with myelopathy and central nervous system demyelination. (*Id.*).

On June 23, 2010, Plaintiff returned to Dr. Singh and reported that she was still experiencing left leg and shin pain after walking on uneven surfaces or for long distances, but improved carpal tunnel syndrome. (*Id.* at 669, 671). Dr. Singh prescribed more Lidoderm patches and Voltaren topical gel. (*Id.*).

Plaintiff visited Dr. Singh on November 19, 2010, and reported that she was still experiencing left leg and shin pain after walking on uneven surfaces or for long distances, numbness on the top of the toes on her left foot, and occasional numbness where the bones had broken during her September 2009 fall. (*Id.* at 672). Plaintiff also believed that her left foot was larger than the right. (*Id.*). Dr. Singh diagnosed lumbosacral disc degeneration, and recommended that Plaintiff continue with physical therapy as needed, continue using Lidoderm patches and Voltaren topical gel, and follow up with a podiatrist for possible correction of the left foot arch. (*Id.* at 673-74).

On August 16, 2011, Plaintiff returned to Dr. Singh and said she was experiencing balance problems but had not fallen. (*Id.* at 675-78). Dr. Singh indicated that Plaintiff's symptoms had worsened and ordered an MRI of the spine to rule out a cord lesion, and videonystagmography ("VNG") / brainstem auditory evoked response ("BAER") testing to rule out vestibular dysfunction, among other diagnostic testing. (*Id.* at 677). Dr. Singh diagnosed Meniere's disease. (*Id.*). Diagnostic testing performed that day indicated abnormal bilateral tibial nerve conduction consistent with a lesion distal to the dorsal root ganglio, left C5-C6 radiculopathy, moderate bilateral sensorimotor demyelinating median nerve neuropathy at the wrist consistent with carpal tunnel syndrome, and bilateral L5 radiculopathies with some axonal loss. (*Id.* at 693-708). Apart from that, the diagnostic tests administered that day indicated normal functioning. (*Id.*).

In accordance with Dr. Singh's recommendations, Plaintiff underwent additional diagnostic testing in August 2011. A VNG and posturography taken on August 17, 2011 revealed mild peripheral vertigo consistent with cervicogenic vertigo, more on the right than the left side, but was otherwise normal. (*Id.* at 679-87). On August 18, 2011, Plaintiff underwent an MRI of the cervical spine, which indicated moderate central disc protrusion indenting the cord at C4-C5, a small central disc osteophyte complex at C3-C4, a small posterior disc osteophyte complex with bilateral uncovertebral spurring at C5-C6, a small posterior disc osteophyte complex at C6-C7, a possible posterior fossa arachnoid cyst, and straightening, but was otherwise normal. (*Id.* at 688-89). On August 25, 2011, Plaintiff underwent MRIs of the thoracic and lumbar spines. (*Id.* at 690-91). The MRI of the thoracic spine revealed no abnormalities. (*Id.* at 690). The MRI of the lumbar spine indicated a small to moderate diffuse disc bulge with worsening central narrowing at L3-L4, an unchanged and mild disc bulge at L4-L5, an unchanged grade I posterolisthesis with a small to moderate central disc protrusion, mild central stenosis, and bilateral facet osteoarthritis with ligamentum flavum hypertrophy at L5-S1. (*Id.* at 691).

Plaintiff returned to Dr. Singh on September 22, 2011, her chief complaints being left leg pain and balance problems. (*Id.* at 709-12). Plaintiff reported no significant improvement since her last visit. (*Id.* at 709). Dr. Singh's notes from the visit indicate that the August diagnostic testing showed worsening radicular symptoms at C5-C6 and hyperreflexia, and left L5 nerve damage. (*Id.* at 711). He opined that Plaintiff's vertigo seemed to be originating from cervical degenerative disc disease. (*Id.*). Dr. Singh added multivitamin infusion therapy to Plaintiff's treatment plan. (*Id.*).

Plaintiff saw Dr. Singh again on January 5, 2012. (*Id.* at 713-16). His notes from this visit indicate that a lumbar epidural steroid injection would be necessary if Plaintiff's condition did not improve with physical therapy. (*Id.* at 715).

On April 16, 2012, Plaintiff visited Dr. Singh and reported that she had been trying to go for walks, but "even half mile walks aggravate her pain." (*Id.* at 555-58). Dr. Singh's noted that Plaintiff's "symptoms have not improved significantly, and at this time, she likely has a significant Partial Permanent Disability, likely 20-30%." (*Id.* at 557).

On October 15, 2012, Plaintiff returned to Dr. Singh and reported experiencing intermittent back pain that radiated to her left leg. (*Id.* at 830). She said it was aggravated by sitting or standing for too long, and that the colder weather may have been aggravating it as well. (*Id.*). She said there was less tingling in her left shin and she had no weakness in her legs. (*Id.*). Dr. Singh reported that Plaintiff's balance had stabilized since the last visit and her hyperreflexia was better, but that Plaintiff still experienced lumbar radicular symptoms. (*Id.* at 831). Dr. Singh recommended continuing with a Lidoderm patch and Voltaren gel as needed, and noted that Plaintiff would consider physical therapy, acupuncture, and lumbar injections. (*Id.* at 832).

On April 15, 2013, Plaintiff visited Dr. Singh. (*Id.* at 833-35). She reported intermittent left leg and lower back pain during the previous winter, and said that long car rides and prolonged standing prompted the pain. (*Id.* at 833). She reported seeing a chiropractor for treatment. (*Id.*). She said the pain started to flare up the previous weekend when she "was busy at home (cooking, etc)." (*Id.*). Dr. Singh assessed continued cervical and lumbosacral radiculopathy, and peripheral neuropathy, but improving long tract signs. (*Id.* at 834-35). Dr. Singh indicated that they would continue conservative treatment and would consider repeat testing if symptoms

did not respond to medication. (*Id.* at 834). Dr. Singh refilled Plaintiff's previous medications and also prescribed Medrol. (*Id.* at 835).

Plaintiff saw Dr. Singh on April 29, 2013. (*Id.* at 836-38). She reported continuing lumbar radicular pain, but said that the Medrol and Lidoderm prescriptions were helping. (*Id.* at 836). Dr. Singh indicated that they would continue with conservative treatment and would hold off on any further testing. (*Id.* at 837).

On May 23, 2013, Plaintiff returned to Dr. Singh and reported persistent back pain radiating to the left leg. (*Id.* at 839). She had no new symptoms, but was concerned that her pain was not improving. (*Id.*). Dr. Singh referred Plaintiff to Dr. Kirschen to consider lumbar injection or a facet block. (*Id.* at 841). The record contains no evidence that Plaintiff ever consulted with Dr. Kirschen.

On June 2, 2013, Dr. Singh completed a "back and lower extremity medical source statement questionnaire" in connection with Plaintiff's application for disability insurance benefits. (*Id.* at 842-46). He indicated that Plaintiff's diagnoses were diffuse multilevel cervical and lumbosacral degenerative disc disease and spinal stenosis with resultant cervical and lumbosacral radiculopathies, and moderate carpal tunnel syndrome. (*Id.* at 842). He indicated that Plaintiff's prognosis for improvement was fair to unlikely, and said that Plaintiff's condition was chronic. (*Id.*). Plaintiff's symptoms included back pain radiating down the left leg, poor balance, and some memory difficulty. (*Id.*). He indicated that activities such as prolonged sitting or standing and heavy lifting precipitated Plaintiff's symptoms. (*Id.*). His clinical findings included decreased sensation and hyper-reflexivity. (*Id.*). He did not note any side effects from Plaintiff's medication. (*Id.* at 842-43). Dr. Singh opined that Plaintiff was not a malingerer, that emotional factors did not contribute to the severity of Plaintiff's symptoms, and

that her symptoms were often severe enough to interfere with attention and concentration. (*Id.* at 843).

Dr. Singh estimated that Plaintiff could walk one and a half (1.5) blocks without rest or severe pain, continuously sit for one (1) hour, continuously stand for fifteen (15) minutes, sit for less than two (2) hours in total during an eight (8)-hour workday, and stand / walk for about two (2) hours in total during an eight (8)-hour workday. (*Id.* at 843-44). During the course of an eight (8)-hour workday, Dr. Singh estimated that Plaintiff would need to walk around for three (3) minutes every fifteen (15) minutes. (*Id.* at 844). He indicated that Plaintiff would need a job where she could shift positions at will, and he estimated that she would need to take one (1) or two (2) unscheduled five (5)-minute breaks each workday. (*Id.*). He indicated that Plaintiff would not need to elevate her legs when sitting for a prolonged period of time. (*Id.*). Plaintiff did not need to use a cane or other assistive device to walk. (*Id.* at 845). He opined that Plaintiff could occasionally lift / carry up to ten (10) pounds in a work situation. (*Id.*). He indicated that Plaintiff could not do a job that involved any stooping or crouching. (*Id.*). Dr. Singh predicted that Plaintiff's symptoms would likely produce "good days" and "bad days," which would probably result in Plaintiff being absent from work about three (3) times per month. (*Id.*). Dr. Singh indicated that Plaintiff had no additional limitations that would prevent her from working apart from what he had already described. (*Id.*). Finally, Dr. Singh indicated that Plaintiff's described medical conditions had existed and persisted with the aforementioned restrictions since at least September 5, 2009. (*Id.*).

### 5. St. Joseph Hospital Records

On April 9, 2011, Plaintiff went to St. Joseph Hospital with a chief complaint of lower back pain, the severity of which she rated a ten out of ten (10/10). (*Id.* at 741-46). She said the

pain had lasted one (1) day, and that it was exacerbated by movement. (*Id.* at 742). Physical examination revealed tenderness of the lower back, but was otherwise normal. (*Id.*). An X-ray of the lumbar spine indicated loss of normal lordosis. (*Id.* at 743). Plaintiff was diagnosed with lower back pain, prescribed Motrin and Skelaxin, and released the same day. (*Id.* at 743-44).

### 6.    Dr. Michael Tumen – Podiatrist

On August 15, 2011, Plaintiff visited Dr. Michael Tumen, a podiatrist whom she first saw on February 9, 2010, and reported sharp pains in her left lateral ankle when she moved in a certain way. (*Id.* at 786, 788-89). Examination revealed mild edema and adequate range of motion. (*Id.* at 786). X-rays of the ankle revealed some arthritic changes and some impingement in the lateral gutter. (*Id.*).

Plaintiff returned to Dr. Tumen on November 17, 2011, reporting continuing problems with her left ankle. (*Id.* at 785). Examination revealed reduced strength (three (3) out of five (5)) in her left foot, tenderness in the left ankle triggered by movement, and painful heel fissures bilaterally. (*Id.*). The heel fissures were debrided and Dr. Tumen recommended that Plaintiff use topical skin emollients. (*Id.*). On December 1, 2011 Dr. Tumen prescribed Plaintiff x-viate, a topical emollient. (*Id.* at 784).

Plaintiff saw Dr. Tumen on February 16, May 17, and June 19, 2012. (*Id.* at 781-83). Dr. Tumen's notes from each of these visits indicate that Plaintiff was doing well and that her left heel fissures were debrided on each occasion. (*Id.* at 781-83).

On September 14 and November 28, 2012, Plaintiff returned to Dr. Tumen for debridement of fissures on both heels. (*Id.* at 779-80). On each occasion, Dr. Tumen noted that the left heel had a deep fissure. (*Id.*).

Plaintiff visited Dr. Tumen on January 23, March 20, and June 12, 2013 for further debridement of heel fissures. (*Id.* at 775, 777-78). On each occasion, Plaintiff reported that she was using prescribed topical pain relief cream daily, but was still experiencing pain. (*Id.*).

### 7. Vanessa Troise – Chiropractor

Plaintiff began chiropractic treatment with Vanessa Troise, a chiropractor, on May 19, 2011. (*Id.* at 561). On March 22, 2012, Plaintiff saw Ms. Troise for lower back pain, which was causing irritability, stiffness in the middle and lower back, and shoulder pain. (*Id.* at 820). Notes from the March 22 session indicate that it was very uncomfortable for Plaintiff to stand for long periods of time, that walking for too long aggravated Plaintiff's lower back and leg, and that Plaintiff had difficulty bending and lifting. (*Id.*). Plaintiff's "symptoms [had] improved from a 9 to about a 4" since beginning chiropractic treatment, and "[had] definitely improved a great deal." (*Id.*).

Notes from September 18, October 2, and October 15, 2012 indicate that Plaintiff felt somewhat better and that her condition was improving as anticipated. (*Id.* at 821).

### 8. Dr. Chaim Shtock – SSA Examining Orthopedist

On August 24, 2012, Plaintiff saw Dr. Chaim Shtock, an orthopedist, for an orthopedic examination upon the referral of the Division of Disability Determination. (*Id.* at 721-24). Plaintiff informed Dr. Shtock about a fall in 2003, which caused injury to her left shoulder, and her September 2009 fall, which caused her to fracture her left ankle. (*Id.* at 721). Plaintiff complained of pain in her lower and middle back that was five out of ten (5/10) on the severity scale, episodic left ankle pain that was seven out of ten (7/10) and aggravated by prolonged standing and walking, and episodic pain in her left shin that was four out of ten (4/10). (*Id.*). Plaintiff's current medications were Crestor, Levothyroxine, Voltaren, and Escitalopram. (*Id.* at

722).   Plaintiff reported being independent in light cooking, cleaning, laundry, showering, dressing, and grooming.   (*Id.*).   Dr. Shtock observed that Plaintiff did not appear to be in acute distress, had a normal gait, was able to walk on her heels but unable to walk on her toes, could only squat to thirty-five percent (35%) maximum capacity due to back pain, used no assistive devices, and had no difficulty getting on and off the exam table or getting up from a chair.   (*Id.*).   Examination of Plaintiff's cervical, thoracic, and lumbar spine revealed reduced lumbar extension, lateral flexion and rotary movements.   (*Id.* at 723).   Plaintiff had tenderness in the thoracic and lumbar spine, left shin, and left ankle.   (*Id.*).   Examination revealed normal strength, range of motion, and functioning otherwise.   (*Id.*).

Dr. Shtock concluded that Plaintiff had moderate limitations with heavy lifting, squatting, kneeling, crouching, frequent stair climbing, walking long distances, standing for long periods, sitting for long periods, and frequent bending.   (*Id.* at 724).   Plaintiff had no other physical limitations or functional deficits in Dr. Shtock's opinion.   (*Id.*).

### 9.        Dr. S. Flowers Williams – State Agency Medical Consultant

On November 7, 2012, Dr. S. Flowers Williams, a state agency medical consultant, completed a physical residual functional capacity assessment form following review of Plaintiff's medical records and reported that Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for about six (6) hours in an eight (8)-hour workday, sit for about six (6) hours in an eight (8)-hour workday, and that Plaintiff was able to push and pull without limitation.   (*Id.* at 620-25).   He reported that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that she had no manipulative, visual, or communicative limitations.   (*Id.* at 622).   Dr. Flowers Williams reported

that Plaintiff's only environmental limitation was that she needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.   (*Id.* at 623).

### 10.     Dr. John Bruno – Plaintiff's Counsel's Examining Orthopedist

On February 25, 2013, Plaintiff was examined and evaluated by Dr. John Bruno, an orthopedist, at the request of her attorney.   (*Id.* at 771-73).   Plaintiff reported continuing problems with her ankle, but that no further treatment was being undertaken.   (*Id.* at 771). Plaintiff complained of pain, loss of motion, weakness, difficulty walking, and tenderness in the left ankle.   (*Id.* at 772).   Physical examination revealed atrophy of the left calf muscles, tenderness in the left leg, mildly limited range of motion in the left ankle in all planes, and minimal crepitus in the left ankle.   (*Id.*).   X-rays showed that Plaintiff's left ankle fractures had healed and revealed no evidence of arthritis.   (*Id.*).   Dr. Bruno concluded that Plaintiff's prior treatment had been appropriate, and that Plaintiff had a fifteen percent (15%) impairment of the left lower extremity.   (*Id.* at 773).   He recommended surgical removal of the hardware in Plaintiff's left ankle, which would decrease tenderness and improve functioning.   (*Id.*).

### D.     The ALJ's Decision

The ALJ employed the five (5)-step sequential analysis set forth in 20 C.F.R. § 404.1520 and found that Plaintiff was not "disabled" during the relevant time period.   (*Id.* at 9-26).   At step one (1), she found that Plaintiff met the insured status requirements through December 31, 2014, and had not engaged in substantial gainful activity since September 5, 2009, the alleged onset date.   (*Id.* at 14).   At step two (2), she determined that Plaintiff had the following "severe" impairments: residuals of a left ankle fracture, peripheral vertigo, degenerative disc disease of the cervical and lumbar spines, and asthma.   (*Id.*).   At step three (3), the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically

equals the severity of any of the *per se* disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 15). Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "sedentary work" as defined in 20 C.F.R. 404.1567(a), with the following additional limitations:

> She is able to occasionally lift ten pounds and frequently lift five pounds; sit for approximately six hours and stand or walk for approximately two hours in an eight-hour day with normal breaks; but is able to only occasionally climb ramps or stairs. In addition, she should never climb ladders, ropes or scaffolds; only occasionally balance and stoop; and never kneel, crouch or crawl. She has unlimited ability to push/pull. She must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, hazards such as machinery and heights, and temperature extremes.

(*Id.*).

At step four (4), the ALJ found that, given Plaintiff's RFC, she was capable of performing her past work as a receptionist. (*Id.* at 20-21). Accordingly, the ALJ found that Plaintiff had not been disabled, as defined under the Social Security Act, from September 5, 2009, the alleged onset date, through the date of the decision. (*Id.* at 21).

## II.     DISCUSSION

### A.     Standard of Review

A court reviewing the final decision of the Commissioner may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)). "[I]t is not the function of the reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198

F.3d 45, 52 (2d Cir. 1999). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotations and citations omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotations and citations omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Courts must ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine whether the "error of law *might* have affected the disposition of the case." *Id.* at 189 (emphasis added). If so, the Commissioner's decision must be reversed. *Id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

"Upon setting aside the Commissioner's decision, the court may either remand for a new hearing or remand for the limited purpose of calculating benefits." *Maline v. Astrue*, No. 08-cv-1712, 2010 WL 4258259, at *2 (E.D.N.Y. Oct. 21, 2010) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). "Remand for the calculation of benefits is appropriate when the record

provides persuasive proof of disability and the application of the correct legal standards 'could lead to only one conclusion.'" *Id.* However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," the court should remand "for further development of the evidence." *Rosa v. Callahan,* 168 F.3d 72, 82-83 (2d Cir. 1999). Where "further administrative proceedings would serve no purpose, remand for the calculation of benefits is warranted." *Sublette v. Astrue*, 856 F. Supp. 2d 614, 619 (W.D.N.Y. 2012).

### B.      Evaluation of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated under the Social Security Act require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145,

151 (2d Cir. 2012).  The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i) and (b).  "Substantial work activity … involves doing significant physical or mental activities."  20 C.F.R. § 416.972(a).  "Gainful work activity … is the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 416.972(b).  If a claimant is doing "substantial gainful activity," the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i) and (b).  If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement."  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509.  The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant's impairment meets or equals any of the listings and meets

the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the Commissioner does not determine that the claimant is disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, the ALJ considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has the capability to adjust to other work, the claimant is not disabled. *Id.* If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving the first four (4) steps of the sequential analysis, and the burden shifts to the Commissioner at the final step. *See Talavera*, 697 F.3d at 151.

## C. The ALJ's Decision Is Supported by Substantial Evidence

In rendering her RFC determination, the ALJ first considered Plaintiff's hearing testimony and statements to Dr. Shtock (the orthopedist who examined Plaintiff at the request of the SSA)

concerning her daily activities. (Tr. at 16). Plaintiff testified that she drives a car, runs errands, prepares dinner, puts groceries away, socializes with friends and family, sorts / folds laundry (while seated), dines out, crochets, reads, and does puzzles. (*Id.*). Plaintiff told Dr. Shtock that she independently cares for herself (*e.g.*, grooming, showering, dressing), cooks, and does household chores. (*Id.*). The ALJ also noted that it is "significant that she uses no assistive device or brace, which corroborates the conclusion that her ankle is essentially healed." (*Id.*).

The ALJ next considered relevant medical evidence. (*Id.* at 17-19). She discussed Plaintiff's September 5, 2009 fall and left ankle fracture, and subsequent progress notes from Dr. Watnik (Plaintiff's orthopedic surgeon) and Plaintiff's physical therapist that indicated proper healing of the ankle and steady improvement with treatment. (*Id.* at 17). The ALJ noted that records of Dr. Rubin (the pain management specialist) showed, *inter alia*, no tenderness and normal reflexes, sensation, and strength in the left ankle / foot, and normal movement of the cervical, thoracic, and lumbar spines. (*Id.*).

The ALJ considered the opinions of Dr. Shtock and Dr. Bruno, and noted that, apart from some tenderness and reduced ability to squat, Dr. Shtock's physical examination of Plaintiff revealed essentially normal physical functioning and strength, and that Dr. Shtock had concluded that Plaintiff had moderate limitations with heavy lifting, squatting, kneeling, crouching, frequent stair climbing, walking long distances, standing or sitting for long periods, and frequent bending, but had no other occupational limitations. (*Id.* at 18-19). As noted by the ALJ, Dr. Bruno concluded that she had only a fifteen (15%) impairment of the left lower extremity. (*Id.* at 18). The ALJ appropriately assigned "considerable weight" to the opinions of Drs. Shtock and Bruno, as they were supported by other medical evidence in the record, including each other's records and opinions. (*Id.* at 18-19); *see Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)

(consultative examiner's opinion constituted substantial evidence and trumped conflicting opinion of treating medical personnel).

Despite the fact that Dr. Singh was Plaintiff's treating neurologist, the ALJ properly declined to treat Dr. Singh's opinion regarding Plaintiff's RFC as controlling. Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)). In order to override the opinion of the treating physician, the ALJ must consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

The ALJ considered these factors. She noted that Dr. Singh is a neurologist who began treating Plaintiff on February 9, 2010. (Tr. at 16-17). She considered diagnostic evidence in the record that tended to support Dr. Singh's RFC determination, including MRIs taken on March 10, 2010 that showed osteophytes in certain spots on the cervical spine and disc bulges at a few spots on the lumbar spine, and March 1, 2010 nerve conduction studies that showed signs of radiculopathy in areas of the lumbar and cervical spines. (*Id.* at 18). And the ALJ explicitly considered other medical evidence in the record that was inconsistent with Dr. Singh's restrictive RFC determination, including: (i) the aforementioned opinions of Drs. Shtock and Bruno following physical examinations (one of which was performed at the request of Plaintiff's own attorney); (ii) Dr. Singh's own previous physical examinations that showed largely normal

strength, coordination, and functioning, and his prior opinions that Plaintiff "did well after surgery" and that she "is able to be on her feet for a good portion of the day at home"; (iii) MRIs ordered by Dr. Singh that did not reveal any evidence of disc herniation in either the lumbar or cervical spine; (iv) progress notes from Dr. Watnik (Plaintiff's orthopedist) indicating that Plaintiff's left ankle healed appropriately following surgery and that pain, swelling, and tenderness decreased over time and with treatment; and (v) Dr. Rubin's (the pain management specialist) finding's following a physical exam that Plaintiff had no tenderness, and normal reflexes, sensation, and strength in her left foot / ankle, and normal movement throughout the spine without tenderness.   (*Id.* at 17-19).   Accordingly, the ALJ rendered her decision in accordance with the treating physician rule, and her determination that Plaintiff retained the RFC to resume her previous work as a receptionist (classified as a sedentary work) is supported by substantial evidence.

## III.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted.   The Clerk of the Court is directed to close this case.


**SO ORDERED.**


*s/ Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated:   July 15, 2016
             Central Islip, New York